FORREST CITY GROCER COMPANY *v.* CATLIN, EXECUTOR.

4-4400

Opinion delivered November 9, 1936.

*E. J. Butler, C. W. Norton* and *Mann & Mann,* for appellants.

*Marvin B. Norfleet,* for appellee.

SMITH, J. Mrs. Ophelia Hall, who is the wife of John W. Hall, owned a farm of 240 acres in St. Francis county, which is described as "all that part of section 25 which lies on the east side of Burnt Cane Lake, township 5 north, range 4 east," which was known as the Burnt Cane farm, and which description we will employ for brevity. Her husband owned other lands which he farmed in conjunction with the Burnt Cane farm. He had a store in Widener and operated a commissary on the Burnt Cane farm. There is a conflict in the testimony as to whether Mr. or Mrs. Hall operated the Burnt Cane farm and the commissary thereon; but we think the testimony clearly established the fact that he operated both the store and the commissary and all the farms.

The undisputed testimony shows that in the operation of these interests Mr. Hall became indebted in 1919

to Bailey-Ball-Pumphrey Company, cotton factors in Memphis, Tennessee, in the sum of $12,000. This was his debt, and not that of Mrs. Hall, but he gave a note covering this indebtedness which she also signed. For the admitted purpose of protecting Mrs. Hall's property from this indebtedness and her liability therefor, there was executed a trust deed, purporting to have been signed by both Hall and his wife, to Judge E. A. Rolfe, on March 8, 1920, securing the payment of a note to the order of Judge Rolfe for $10,000, due November 20, 1920, covering the Burnt Cane farm. This instrument was duly recorded, and was satisfied of record by Judge Rolfe January 20, 1921. This instrument purports to have been executed by both Mr. and Mrs. Hall, and to have been acknowledged by both of them before P. B. Arnold, a notary public.

On November 23, 1920, application was made to the Dickinson-Reed-Randerson Company, an Oklahoma corporation, for a loan of $10,000, which recited the outstanding incumbrance against the Burnt Cane farm, and that the purpose of the loan was to discharge that debt. This application was signed in the name of Ophelia Hall by John W. Hall and by John W. Hall. It is undisputed that Mrs. Hall did not sign this application. The application was approved, and a mortgage was executed on November 23, 1920, which purports to have been signed by both Ophelia Hall and John W. Hall. Their signatures were witnessed by Perry B. Arnold, who, as a notary public, took their acknowledgments on the same day. The original of this instrument is in the transcript before us. The certificate of acknowledgment recites that Arnold is a notary public duly commissioned and acting, and is in proper form. The impression of his notarial seal appears on the instrument, and he certifies that his commission as a notary public expires March 5, 1924. This mortgage purports to secure a loan of $10,000, due December 1, 1930, bearing interest at the rate of 7 per cent. per annum, and attached thereto, as a part thereof, were ten interest notes, of $700 each, one due each year after date.

The loan was consummated by a draft on Dickinson-Reed-Randerson Company for $10,000 in favor of E. A. Rolfe, signed by J. B. Weatherton, the mortgagees' agent, and recited its purpose to be "For release of E. A. Rolfe's mortgage, recorded book 80, page 567, St. Francis County, Arkansas." This draft was indorsed by Judge E. A. Rolfe, and was deposited in a bank at Forrest City, and was paid in due course. Mr. Hall admitted that he received the proceeds of this draft, which were disbursed by him in the discharge, in part, of his indebtedness.

This mortgage was sold and duly assigned on December 23, 1920, for full value, to Julia P. Warren, a resident of the state of Illinois, but the original mortgagees continued to act as her agent in collection and remittance of the annual interest payments. Default was made, and on September 2, 1932, Mrs. Warren filed suit in the St. Francis chancery court to foreclose the mortgage, and all persons in interest were made parties. It is stipulated that Mrs. Warren bought the mortgage in good faith and paid full value therefor. She died subsequent to the institution of this suit, and it has been revived in the name of her executor. A receipt for the ten thousand dollar draft payable to Judge Rolfe's order was taken at the time of its delivery purporting to have been signed by both Ophelia and John W. Hall and witnessed by J. B. Weatherton, who did not testify at the trial. He was dead at that time.

On April 2, 1927, Hall and wife executed a trust deed conveying the Burnt Cane farm to the First National Bank of Forrest City, which, on March 14, 1929, was duly assigned to the Forrest City Grocer Company. On March 1, 1929, Mr. and Mrs. Hall executed a trust deed on the same property to the Forrest City Grocer Company, securing an indebtedness recited to be $36,000. On November 21, 1930, Mr. and Mrs. Hall executed a quitclaim deed to the property to the Forrest City Grocer Company.

The Grocer Company filed an answer and cross-complaint, denying the validity of Mrs. Warren's mortgage and praying its cancellation. An answer and cross-

complaint was also filed by Mrs. Hall, in which she denied any and all knowledge of the transactions above recited. She admitted signing the $12,000 note to Bailey-Ball-Pumphrey Company, but denied signing or executing the mortgage to Judge Rolfe. She denied signing the application for the loan or the receipt for its proceeds. She denied signing or acknowledging the mortgage here sought to be foreclosed and alleged and later testified that her first knowledge thereof came after the summons had been served upon her in this case. Mr. Hall fully corroborates the testimony of his wife, but his narration of his own perfidy disentitles his testimony to any weight. *Callaway* v. *Ashby,* 192 Ark. 929, 95 S. W. (2d) 907.

P. B. Arnold also testified. He stated that at the time of the date of the alleged acknowledgment he was employed by Mr. Hall, who had secured his appointment as a notary public for his own convenience in connection with the business Hall was operating. It was shown that Arnold did not execute and file the bond required of all notaries public by § 7969, Crawford & Moses' Digest.

We have before us a voluminous record. Mrs. Hall testified in support of the allegations of her answer that she knew nothing of the transactions, and was cross-examined at great length. She attempted to show her own management of her own affairs and the operation of the commissary on her farm. This was done to prove her indebtedness to the Forrest City Grocer Company, evidenced by the trust deed which she executed to that company, and to show the consideration which induced the execution of the quitclaim deed to that company. Without reciting this testimony, it may be said that it was evasive and uncandid, and some of it appears to be preposterous. For instance, the mortgage to the grocer company recited that it was given to secure an indebtedness due and to become due amounting to $36,000. She was asked: "Q. The mortgage was dated March 1, 1929, and the note was payable November 1, 1929, the same year, and did it take that much to operate the place?" She answered: "Yes, sir, I suppose it did." When

asked to produce her books showing these transactions, she stated they were destroyed when the quitclaim deed to the grocer company was executed.

We do not mean to question the existence of the debt to the grocer company. That appears to be established by the undisputed testimony, but our conclusion, in relation thereto, is that this was a part of the indebtedness which Mr. Hall had incurred in the operation of his own business, including the Burnt Cane farm, of all of which Mrs. Hall must have had at least general knowledge.

Mrs. Hall testified, as has been stated, that she knew nothing of the mortgage here sought to be foreclosed until the summons was served upon her; yet it is shown that a prior suit to foreclose was brought in the federal court at Helena, in which service was apparently had upon both Mr. and Mrs. Hall. She denied that the United States marshal had served her with process, as his return recited, and Mr. Hall testified that the service was had upon him for both himself and his wife.

Mr. Hall testified that he paid interest on the loan for the first six years, but that he never told his wife anything about making these payments. They were not promptly made, and it was shown that for each of these six years three notices were addressed and mailed to Mrs. Hall, any one of which would have apprised her of the existence of the mortgage. It is highly improbable that Mr. Hall could have concealed from his wife the receipt of all this mail addressed to her. Correspondence offered in evidence shows that Hall was in default in paying interest, and to secure indulgence in the extension of time he deposited with the original mortgagees the rent notes of that year, which were payable to the order of Mrs. Hall. Mr. Hall admits forwarding the notes as collateral, but he says the notes purporting to be original were only copies or dummy notes the originals of which were retained by Mrs. Hall in her possession.

The court below made no specific finding of fact, but did dismiss as being without equity the pleadings of Mrs. Hall and those of the grocer company, which

prayed the cancellation of the mortgage here sought to be foreclosed, and ordered its foreclosure as a prior lien. This order must necessarily have been predicated upon the finding that the mortgage assigned to Mrs. Warren was a valid instrument; and we are unable to say that this finding is contrary to the preponderance of the evidence.

The testimony may be summarized as follows. Against the testimony of Mr. and Mrs. Hall and Mr. Arnold are the following facts. Mrs. Hall admits signing the $12,000 note to Bailey-Ball-Pumphrey Company. The mortgage to Judge Rolfe was executed for the purpose of covering up her property from sale in its satisfaction. That mortgage purports to have been signed and acknowledged by her. In view of the confidential relation which must have existed between Mrs. Hall and her husband it is almost incredible that she was not advised of that transaction and the subsequent action relating thereto. Now, it is true, as has been stated, that Arnold, the notary public, testified that Mrs. Hall did not sign the mortgage in his presence, nor did she appear before him and acknowledge its execution. He testified that he wrote the certificate of acknowledgment at the direction of Mr. Hall, his employer. This may or may not have been true; but he also testified that he was familiar with Mrs. Hall's signature, and that he examined the signature and thought at the time it was Mrs. Hall's.

Our conclusion is that if Mrs. Hall did not in fact sign and acknowledge the mortgage, she permitted her husband, as her agent, to procure this loan upon the representation—which she must have known would be made—that she had in fact done so, and it would be grossly inequitable to hear her now deny this fact.

Upon the question whether Mrs. Hall may not actually have signed the mortgage, we have the testimony of a handwriting expert, whose deposition was taken. There was submitted to him for examination and comparison the disputed signatures and certain signatures admitted to be genuine. Photostatic enlargements of these signatures were made, and this witness, after stat-

ing his qualifications and experience, gave a detailed discussion of the points of similarity in the signatures, which led him to the opinion that all the signatures had been written by the same person. Our conclusions are not controlled by this testimony, as we recognize the fact that such testimony is usually biased and is frequently worthless; but we cannot say that it is without probative value.

We, therefore, conclude, as the chancellor must have done, that, if Mrs. Hall did not in fact sign and acknowledge the mortgage, she permitted her husband to perpetrate what would be an egregious fraud, if the mortgage were declared to be void as a forgery of her name, by clothing him with apparent authority as her agent. *Laseter* v. *Terral*, 168 Ark. 435, 270 S. W. 520; *Fletcher* v. *Dunn*, 188 Ark. 734, 67 S. W. (2d) 579.

The testimony of A. G. Sweet tends to confirm our conclusion. He was engaged in the mercantile business at Widener, a town of about 250 people, in which town the Halls also resided. He had sold goods to Hall, and to secure the debt thus incurred he had taken a mortgage on lands owned by Hall securing an indebtedness of $5,000. The acknowledgment to this mortgage both of Hall and his wife was taken by Arnold, and its validity does not appear ever to have been questioned. Hall had promised to pay this debt out of the proceeds of the loan secured by the mortgage here sought to be foreclosed, but at Hall's request he consented that Judge Rolfe be first paid, and he was not paid with this money, but his debt was later paid out of the proceeds of another loan obtained on the security of other lands owned by Hall. Witness stated that Widener is a town so small that every one knows everybody and something of their business by observation and hearsay. He had known the Halls for twenty-five years, and he had never known Mr. Hall to carry on any business in the name of his wife.

It is argued that Arnold was not in fact a notary public, and that the mortgage was, therefore, an unacknowledged instrument, and as such was not entitled to record, and, therefore, the grocer company is unaf-

fected by even the actual notice of its existence and record which it is admitted the officers of the grocer company had before taking its mortgage or the quitclaim deed. But not so. Arnold was at least a *de facto* notary public. He was in possession of that office, and assumed to act as such. He placed upon the mortgage the impress of his notarial seal, and wrote upon the mortgage the date of the expiration of his commission, as he was required to do by § 7971, Crawford & Moses' Digest. Arnold was a notary public *de facto*, if not *de jure*.

Our leading case on the authority of *de facto* officers, which has since been frequently followed, is that of *Pierce* v. *Edington*, 38 Ark. 150. Justice EAKIN there said: "Mr. Greenleaf (Ev., § 92, n. 5), describing an officer *de facto*, says that he is one who exercises an office either by virtue of some appointment ·or election; or of such acquiescence of the public as will authorize the presumption, at ·least, of a colorable appointment or election." The cases of *Stevens* v. *Shull*, 179 Ark. 766, 19 S. W. (2d) 1018, 64 A. L. R. 1258, 178 Ark. 269, 10 S. W. (2d) 511, and *McClendon* v. *State ex rel.*, 129 Ark. 286, 195 S. W. 686, L. R. A. 1917F, 535, are to the effect that the authority of a *de facto* officer to act cannot be inquired into in a collateral proceeding.

The undisputed testimony is to the effect that Mr. Hall himself procured the appointment of Arnold as a notary public, and that Arnold acted as such, although he may not have qualified himself as required by § 7969, Crawford & Moses' Digest, by making and filing bond with the recorder of deeds for St. Francis county.

The recent case of *Callaway* v. *Ashby, supra,* announced the rule which should be applied in the decision of this case, which is that, whether Mrs. Hall actually signed and acknowledged the mortgage or not, she was advised of the facts relating thereto, and permitted her husband to deliver the mortgage as a valid instrument, and she is, therefore, estopped to deny its validity.

The decree of the court below accords with this view, and it is, therefore, affirmed.