BROWN *v.* ANDERSON.

4-8129                                          198 S. W. 2d 188

Opinion delivered December 23, 1946.

*Sidney S. McMath, Nathan L. Schoenfeld, David B. Whittington,* and *C. Floyd Huff, Jr.,* for appellants.

*Jay Rowland, Curtis L. Ridgway, Lloyd E. Darnell, Fred Johnson,* and *James R. Campbell,* for appellees.

ED. F. McFADDIN, Justice. This appeal involves four election contests stemming from the Democratic Primary election held in Garland county on July 30, 1946. In Case No. 6991 in the Circuit Court, I. G. Brown was contestant, and Marion Anderson and Charles Dugan were contestees. Each of these three parties was a candidate for the Democratic nomination for Sheriff of Garland county; and, as a result of the July 30th election, the County Democratic Central Committee on August 2, 1946, certified Anderson to be the nominee, as having received a clear majority of all votes. On August 12th, Brown filed this contest, alleging illegal votes and other irregularities and claiming, *inter alia,* that Brown received the nomination. It is not necessary to detail any of the allegations, as the case was not tried on these allegations. With the complaint, there was filed the affidavit signed and sworn to by 10 or more Democratic electors before Frank Carpenter, as a notary public. The qualification of the notary public is one of the issues here.

In case No. 6992 in the Circuit Court, Q. Byrum Hurst was contestant, and Elza T. Housley and Barney H. Roark were contestees; and there was involved the Democratic nomination for County Judge of Garland county. In case No. 6993 in the Circuit Court, Leonard R. Ellis was contestant, and John E. Jones and Billy I. Dale were contestees; and there was involved the Democratic nomination for Circuit and Chancery Clerk of Garland county. In case No. 6990 in the Circuit Court, Clyde H. Brown was contestant, and Earl Witt and Morris Hecht were contestees; and there was involved the Democratic nomination for Circuit Judge of the 18th Judicial District of Arkansas.

In each of the four cases there was the affidavit signed and sworn to by 10 or more Democratic electors

before Frank H. Carpenter as notary public. In each case, the contestees filed motion to dismiss the contest; and, in each case, the trial court—after hearing evidence—sustained the motion to dismiss on the sole ground that "the notary public was not qualified to administer an oath, being neither a *de jure* nor a *de facto* notary public." From the said orders of dismissal, the four contestants have prosecuted appeals; and all four of the circuit court cases are consolidated in one case in this court, since the issues in each case are identical. We will now refer to the contestants as appellants, and the contestees as appellees.

During the pendency of the appeal there occurred the general election on November 5, 1946, wherein appellees Anderson, Housley, Jones and Witt were shown as the Democratic nominees for the offices of Sheriff, County Judge, Circuit Clerk and Circuit Judge, respectively; and wherein the appellants were their respective opponents. The general election resulted in a victory for the appellants in each instance; and, as a result thereof, the appellees have filed a motion in this court to dismiss the appeal as moot. There are thus presented two questions: (1) is the appeal moot?; and (2) was the notary public qualified to act. We dispose of these questions in the order listed.

I. *Is the Appeal Moot?* The appellees say: that, since each of the appellants won in the general election the same office for which he seeks the Democratic nomination in the case at bar, therefore, the question of who was entitled to the Democratic nomination has become of no importance. In *Pearson* v. *Quinn,* 113 Ark. 24, 166 S. W. 746, we quoted this sentence from a North Carolina case:

"The court will not go through the record merely to decide who would have won, if the cause of action had not died pending appeal; that it will not decide the merits of a controversy which no longer exists, merely to determine who shall pay the costs."

The quoted statement emphasizes the application of the term "moot" in the case at bar. Has the cause of

action of each appellant ceased to exist by virtue of the result of the general election, in which each appellant was successful? Our own case of *Cain* v. *CarlLee,* 171 Ark. 155, 283 S. W. 365 is full authority for our negative answer to this question. Obtaining the office in the general election is one thing; but obtaining the Democratic nomination in the primary is quite another thing. Cain and CarlLee were rival candidates for the Democratic nomination for County Judge of Woodruff county in the primary election of 1924. CarlLee was certified as the nominee, and Cain filed a contest. The case, in one phase or another, appears four times in the reports of this court. See 168 Ark. 64, 269 S. W. 57; 169 Ark. 887, 277 S. W. 551; 171 Ark. 155, 283 S. W. 365; and 171 Ark. 334, 284 S. W. 40. After the second opinion of this court, and while a third appeal was pending, CarlLee resigned the office of County Judge, and then moved this court to abate the cause as moot. But we held that Cain's right to be declared the Democratic nominee, if he honestly won the primary election, was a right that could not be taken from him. We pointed out that, under the Arkansas election laws, Cain had a "right of action" to contest CarlLee's Democratic nomination; and we said of Cain's right:

"He was entitled to prosecute this cause of action so long as CarlLee resisted, or until there had been a final decision determining the case against him."

It is true that there was a dissenting opinion in the case; but we still adhere to the holding of the majority. That case was decided in 1926. Eight regular sessions of the General Assembly have intervened from then until now. No law has been enacted seeking to change the rule there announced, which was to the effect that the right to prosecute a contest for the Democratic nomination was a cause of action. We do not change that rule now.

To see that the Democratic nomination is a valuable privilege, we have only to read the case of *Terry* v. *Harris,* 188 Ark. 173, 64 S. W. 2d 324. There, certain persons were allowed to be interrogated as to whether

they had supported the Democratic nominees in the most recent state election. Likewise, in the case of *Trussell v. Fish*, 202 Ark. 956, 154 S. W. 2d 587, there was detailed how a lack of party loyalty was urged against electors. So, in the case at bar: in the general election of 1948 some of these appellants might be questioned as to their party loyalty, if appellees are left to be the Democratic nominees, since appellants opposed them in the 1946 general election. In Arkansas the right to the Democratic party nomination is a valuable thing; and even if appellants won in the general election, still they have the continuing right to a trial to determine whether they were entitled to the Democratic nomination; and this to establish their party rights. So, we hold that the case is not moot.

II. *Was the Notary Public Qualified to Act?* This was the point on which the case was decided in the trial court. As previously stated, each contest petition was signed and sworn to by 10 or more Democratic electors before Frank Carpenter as a notary public in and for Garland county, Arkansas. This affidavit is required by § 4738, Pope's Digest; and we have held that it is jurisdictional. See *Lanier* v. *Norfleet,* 156 Ark. 216, 245 S. W. 498; and *Kirk* v. *Hartlieb,* 193 Ark. 37, 97 S. W. 2d 434. The trial court found that the affiants were qualified electors and members of the Democratic party; but that "the notary public was not qualified to administer an oath, being neither a *de jure* nor a *de factor* notary public."

The facts as regards Frank Carpenter's notarial status are these: He first moved to Garland county in 1938, and purchased and still owns "a lot to build a house on." He was a qualified voter, and voted in Garland county in 1940. In December, 1941, he went to Marche, Arkansas, and engaged in war work there and at various other places in Arkansas and Louisiana until "about the first of March," 1946, when he returned to Hot Springs. He paid a poll tax in Garland county on March 5, 1946, (but this did not allow him to vote in any election in 1946 prior to October 1st: Section 4697, Pope's Digest,

as amended by § 2 of Act 82 of 1939). He testified that he had all the time from 1940 maintained a residence at 306½ Orange Street, where he resided at the time of the trial. On June 21, 1946, the Governor of Arkansas appointed Frank Carpenter as a notary public in and for Garland county. He was issued a commission on that date, and duly filed his oath, and his bond as required by § 10362, Pope's Digest. He was possessed of a notarial seal which he used on each affidavit here involved; and on each affidavit there appears the statement that his commission as a notary public expires June 21, 1950.

Against all of this, there is the fact that on June 21, 1946 (when he was commissioned as a notary public), Frank Carpenter did not have a poll tax receipt which allowed him to vote in any election in 1946 prior to October 1st. It is this failure to have a then current poll tax receipt that caused the Circuit Court to hold that Carpenter was not a notary public either *de jure* or *de facto*.

We have held that a notary public is a public officer. *Sonfield* v. *Thompson,* 42 Ark. 46, 48 Am. Rep. 49; *State* v. *Hodges,* 107 Ark. 272, 154 S. W. 506. What is a *de jure* officer, and what is a *de facto* officer? In 46 C. J. 927 a *de jure* officer is defined:

"An officer '*de jure*' is one who is in all respects legally appointed and qualified to exercise the office; one who is clothed with the full legal right and title to the office; in other words, one who has been legally elected or appointed to an office, and who has qualified himself to exercise the duties thereof according to the mode prescribed by law."

Article XIX, § 3 of the Constitution forbids the appointment of anyone to office who does not possess the qualifications of an elector. Since Carpenter did not on June 21, 1946, have the right to vote in an 'election prior to October of that year, it must follow that he was not—on the date of his appointment—a *de jure* officer.

But was he a *de facto* officer? We have in many cases discussed *de facto* officers. Some of these cases

are: *Pierce* v. *Edington,* 38 Ark. 150; *Bank of Almyra* v. *Laur,* 122 Ark. 486, 184 S. W. 39; *Eureka Fire Hose Co.* v. *Furry,* 126 Ark. 231, 190 S. W. 427; *Faucette* v. *Gerlach,* 132 Ark. 58, 200 S. W. 279; *Stafford* v. *First National Bank,* 182 Ark. 1169, 34 S. W. 2d 759; *Forrest City Grocer Co.* v. *Catlin,* 193 Ark. 148, 97 S. W. 2d 910; *Trussell* v. *Fish,* 202 Ark. 956, 154 S. W. 2d 587.

In *Faucette* v. *Gerlach, supra,* Mr. Justice Hart, speaking for this court, quoted two leading authorities, as follows:

" 'A person who enters into an office and undertakes the performance of the duties thereof by virtue of an election or appointment, is an officer *de facto,* though he was ineligible at the time he was elected or appointed, . . .

" 'An officer *de facto* is one who by some color of right is in possession of an office and for the time being performs its duties with public acquiescence, though having no right in fact. His color of right may come from an election or appointment made by some officer or body having colorable but no actual right to make it; or made in such disregard of legal requirements as to be ineffectual in law; or made to fill the place of an officer illegally removed; or made in favor of a party not having the legal qualifications; . . . ' "

Under these definitions Frank Carpenter was certainly a *de facto* notary public when he swore the affiants in the case here involved. Then, as a *de facto* officer, what was the effect of his acts in swearing the affiants. In *Faucette* v. *Gerlach, supra,* we quoted from *Cooley on Constitutional Limitations,* as follows:

" 'But for the sake of order and regularity, and to prevent confusion in the conduct of public business and insecurity of private rights, the acts of officers *de facto* are not suffered to be questioned because of the want of legal authority except by some direct proceeding instituted for the purpose by the State, or by some one claiming the office *de jure,* or except when the person himself attempts to build up some right, or claim some

privilege or emolument, by reason of being the officer which he claims to be. In all other cases the acts of an officer *de facto* are as valid and effectual, while he is suffered to retain the office, as though he were an officer by right, and the same legal consequences will flow from them for the protection of the public and of third parties. This is an important principle, which finds concise expression in the legal maxim that the acts of officers *de facto* cannot be questioned collaterally.' "

In *Stafford* v. *First National Bank, supra,* we sustained a writ of garnishment issued by a *de facto* deputy clerk. In *Forrest City Grocer Co.* v. *Catlin, supra,* there was challenged an acknowledgment taken by a *de facto* notary public. We sustained the acknowledgment, and held that one who has been appointed notary public, and is in possession of the office, and assumes to act as such, is at least a notary public *de facto* whose right to act cannot be questioned in a collateral proceeding. We held that the mortgage acknowledged before such *de facto* notary public was enforceable, although the notary had not qualified himself by making and signing the bond required by statute. Our other cases (as previously listed) on *de facto* officers show other situations, in all of which we have sustained the official action performed by a *de facto* officer; and the rationale of our cases leads to the inevitable conclusion that the affidavits made before Frank Carpenter as notary public should be sustained in the case at bar.

The general rule prevailing in other jurisdictions is in accord with this holding. In 47 C. J. 506, in discussing notaries *de facto,* this rule is stated:

"Generally a person acting as a notary under color of authority with public acquiescence is held to be a notary *de facto,* and as to the public and third persons his acts are valid and cannot be attacked collaterally. The principle that ineligibility to hold an office does not prevent the ineligible incumbent, if in possession under color of right and authority, from being an officer *de facto,* with respect to his official acts, insofar as third persons are concerned, has been applied to one who is

appointed and acts in good faith as notary, but who is ineligible or disqualified to act as such by reason of alienage, sex, or interest, . . ."

Appellees insist, and most strongly rely on *Lanier* v. *Norfleet,* 156 Ark. 216, 245 S. W. 498. At first reading, that case might seem to sustain appellees; but a careful study of the case shows that it is based on facts which distinguish it from the case at bar. *Lanier* v. *Norfleet* was a contested election case in Crittenden county; and the attack on the affidavit was based on the disqualification of the notary public to act in Crittenden county. Templeton, while a citizen of Clay county, had been appointed as notary public, and had qualified and acted as such in Clay county. In 1921, he became a citizen and voter of Crittenden county, and acted as notary public in Crittenden county solely under the commission issued to him while he was a resident of Clay county. We held that when Templeton moved from Clay county he abandoned the office of notary public, and was, therefore, neither a *de jure* nor a *de facto* notary public in Crittenden county, as he never received any appointment of any kind after he became a resident of Crittenden county. Mr. Justice HART succinctly stated the case when he said:

"The undisputed evidence shows that Templeton had removed permanently from Clay county, of which he was a citizen when he was appointed a notary public, to Crittenden county, of which he was a citizen at the time he took the affidavits in question. Consequently, having abandoned his office by his permanent removal to another county, it became vacant, and he was no longer a *de jure* officer. An officer *de facto* must not only perform the duties of the office with public acquiescence, but he must also be in possession of it. *Faucette* v. *Gerlach,* 132 Ark. 58, 200 S. W. 279.

"It is true that the record shows that Templeton was exercising the function of notary public, taking affidavits, acknowledgments, etc., at the time he signed the *jurat* to the affidavits in question as a notary public,

but it cannot be said that he was in possession of the office.

"As we have already said, the act with regard to the appointment of notaries public and their duties must be read together and construed as a whole. When this is done, it is evident that the Legislature intended to make a notary public a county officer, and to create a vacancy in such office when he removed to another county."

*Lanier* v. *Norfleet* holds that, when a notary public moves from the county of his residence, he abandons his office of notary public, and does not become even a *de facto* officer in the county to which he moves. We do not have any such situation as that in the case at bar. So, as previously stated, *Lanier* v. *Norfleet* affords no support to the appellee.

The case at bar presents a situation similar in many respects to that which existed in *Trussell* v. *Fish*, 202 Ark. 956, 154 S. W. 2d 587. In that case certain votes were challenged in an election contest because Eastham (the deputy tax assessor who assessed the challenged voters) was not himself a qualified elector at the time he was appointed, and at the time he assessed the poll taxes challenged. We held that the votes could not be challenged on that ground, stating (in substance) that, even if Eastham was not an officer *de jure*, still he was an officer *de facto*, and his acts could not be questioned collaterally. We said:

"An assessor is a constitutional officer. No statute has been called to our attention declaring void the work of a deputy assessor who was not at the time his duties were being discharged a qualified elector and whose appointment had not been approved by the county court; nor do we know of any such provision of law. . . . In the instant case the assessor was clothed with appointive power. The fact that he proceeded irregularly, or that he appointed a man who was not eligible, cannot deprive voters of their franchise."

So, in the case at bar, the Governor was clothed with the power to appoint a notary public in Garland

county, and he appointed Frank Carpenter, who was commissioned and filed the bond and obtained a seal and used the seal and swore the affiants in the case at bar, all in the county for which he was appointed and commissioned. We, therefore, hold that Frank Carpenter was a *de facto* notary public, when he swore the affiants in the case at bar, and that the affidavits complied with the election law requirements found in § 4738, Pope's Digest.

It follows that the judgments of the Circuit Court dismissing the contests are each reversed, and the causes remanded for further proceedings.

SMITH and McHANEY, JJ., dissent from that part of the opinion which holds that the case is not moot.