PLATTE *v*. DORTCH ET AL.

[No. 570S114. Filed October 27, 1970. No petition for rehearing filed.]

*Nelson G. Grills,* of Indianapolis, for appellant.

*Harry T. Ice, Robert D. Risch, George B. Gavit, Ice Miller Donadio & Ryan, Harold H. Kohlmeyer, Jr.,* Corporation Counsel, all of Indianapolis, for appellees.

HUNTER, C.J.—On March 13, 1969, three residents of Marion County, Indiana, filed an action in the Marion County Superior Court alleging Chapter 173 of the Acts of 1969 (hereinafter referred to as Chapter 173) to be unconstitutional. By that act, the legislature purported to create a "consolidated city" through a comprehensive plan for reorganization of the

pre-existing local governments of Indianapolis and Marion County. The plaintiffs, by their complaint, sought to enjoin the implementation of the terms of the act by the consolidated city and its public officials.

Subsequent to the filing of the first complaint, a supplemental complaint was filed by plaintiffs and an intervening plaintiff, appellant on this appeal, alleging that certain departments of the consolidated city under the terms of Chapter 173 had taken action to issue special taxing district bonds for the purpose of financing certain public improvements. The relief there sought was to enjoin the issuance of these bonds on the basis that such actions were being taken by officials appointed and acting under an unconstitutional act.

The trial court, pursuant to Trial Rule 54(B), entered a final judgment as to the supplemental complaint, holding that the various defendant public officials were de facto officers of the consolidated city under Chapter 173 and that consequently they might validly enter into contracts and issue bonds and notes which would be legally binding obligations of the several special taxing districts involved, each of which taxing districts had been established prior to the effective date of Chapter 173, notwithstanding the challenge to the constitutionality of the act.

On this appeal, appellant raises several questions for our consideration, all of which directly bear on the propriety of allowing the special taxing districts to issue bonds under the authority vested by Chapter 173 prior to a determination of that act's constitutionality. Several points must be decided before that precise question can be answered.

First of all the status of the officers here in question must be determined. Appellant contends, relying heavily on the case of *Norton* v. *Shelby County* (1885), 118 U. S. 425, 30 L. Ed. 178, that the public officials concerned are not de facto officers since there is no de jure office to which they might claim holder. Although that point has not yet been judicially

determined, the contention is consistent with appellant's original allegation that the act itself is unconstitutional. Appellee, on the other hand, argues that the officers are indeed de facto and therefore their acts, under Indiana case law, are valid and binding.

Although the question of the public officials' status would appear to be settled in Indiana, there seems to be an irreconcilable conflict of authority in the various jurisdictions on this point. *Norton* v. *Shelby County, supra,* is perhaps the leading case in the line of authority which holds that the existence of a de jure office is a necessary condition to "de facto officer" status. The courts in Indiana have disagreed with this principle, however, and have held that a de facto officer may exist even where the office he purports to hold may subsequently be found to be grounded on an unconstitutional act. In the case of *City of Michigan City* v. *Brossman* (1938), 105 Ind. App. 259, 11 N. E. 2d 538 (transfer denied) Judge Dudine of the Appellate Court carefully analyzed the *Norton* case and cases there relied upon and concluded that the term de facto officer contemplated among others one who serves in an office created by an unconstitutional statute. The precise area of disagreement centered upon the definitional scope of the term de facto officer as articulated in the case of *State* v. *Carroll* (1871), 38 Conn. 449 and relied upon in *Norton*. In the *Carroll* case the court had there defined a de facto officer in the following language:

> "An officer *de facto* is one whose acts, though not those of a lawful officer, the law, upon principles of policy and justice will hold valid so far as they involve the interests of the public and third persons, where the duties of the office are exercised:
> . . .
> Fourth. Under color of an election or an appointment by or pursuant to a public, unconstitutional law, before the same is adjudged to be such."

It was the Appellate Court's express conclusion that the fourth paragraph of the definition found in *Carroll* and relied upon

in *Norton* included a person who holds an office created pursuant to a statute subsequently held to be unconstitutional. We here re-affirm that position.

Having thus established that the public officials seeking to issue the bonds are de facto officers, the validity of the bonds as binding obligations in respect to third persons can be of no doubt. This court has consistently held that actions taken by de facto officers are binding and valid. See e.g. *Book* v. *State Office Building Commission* (1958), 238 Ind. 120, 149 N. E. 2d 273; *State ex rel. Penn. R. R. Co.* v. *Iroquois Conservancy District Court* (1956), 235 Ind. 353, 133 N. E. 2d 848; *Miller et al.* v. *State ex rel. Tuthill* (1930), 202 Ind. 18, 171 N. E. 381. Although not in issue, the court, in *State ex rel. Penn. R. R. Co.* v. *Iroquois Conservancy District Court, supra,* commented in a footnote on the validity of bonds issued pursuant to a statute there held to be unconstitutional:

". . . it has been called to the attention of the court that two issues of bonds to pay the cost of constructing storm and sanitary sewers, each within a single county, have been sold to the public under the provisions of the Conservancy Act; and that there are now outstanding and in the hands of the general public $261,000 principal amount of one issue and $247,000 of the other.

The question of the validity of these bonds is not an issue in this case, nor do we attempt to incorporate it into those here presented. However, because the acts of the directors appointed in each of these proceedings, involve the interests of the public and of the holders of the bonds still outstanding we feel impelled to call attention to a rule of law as announced by the courts of appeal in this state, which we believe controlling as to the validity of such bonds as were issued prior to the decision of this court herein.

The law seems to be well settled in Indiana that one who is elected or appointed to an office under an unconstitutional statute, before it is adjudged to be so, is an officer *de facto,* and his acts will be valid in respect to the public whom he represents, and to third persons with whom he deals officially. *Parker, et al.* v. *The State, ex rel. Powell* (1892), 133 Ind. 178, 200, 32 N. E. 836, 18 L. R. A. 567;

*Felker* v. *Caldwell* (1919), 188 Ind. 364, 371, 123 N. E. 794; *City of Michigan City* v. *Brossman* (1938), 105 Ind. App. 259, 11 N. E. 2d 538."

In light of the above cited authority, it is readily apparent that there is abundant precedent allowing for the issuance of bonds by de facto officers prior to a decision on the constitutionality of the statute under which such issuance is authorized.

This conclusion, however, in our opinion is not dispositive of the question of whether an injunction should issue prohibiting the issuance of the bonds pending a determination of the act's constitutionality. Thus far we have determined only that the representatives of the various special taxing districts *could,* under Indiana law, issue valid and binding obligations as de facto officers. Appellant contends, nevertheless, that to allow their issuance prior to such a determination is violative of both his Indiana and Federal constitutional rights. Consequently we must first determine the validity of these contentions in order to pass on the propriety of injunctive relief.

Essentially, appellant argues that it is unconstitutional to allow a public official to bind the voting public to long term financial obligations prior to a decision on the constitutionality of the statute from which such authority derives. Specifically, appellant points to Art. 1, § 1, Art. 1, § 12 and Art. 3, § 1, of the Indiana Constitution and the Fourteenth Amendment of the United States Constitution for support of his contentions.

Taking first those provisions specified by appellant found in the Indiana Constitution, we conclude that the action taken by the trial court is not violative of appellant's rights. Art. 1, § 1, provides in pertinent part:

". . . that all power is inherent in the People; and that all free governments are, and of right ought to be, founded on their authority, and instituted for their peace, safety, and well-being."

Art. 1, § 12, as is here pertinent provides:

". . . and every man, for injury done to him in his person, property, or reputation, shall have remedy by due course of law."

Finally, Art. 3, § 1, provides:

"The powers of the Government are divided into three separate departments; the Legislative, the Executive including the Administrative, and the Judicial; and no person, charged with official duties under one of these departments, shall exercise any of the functions of another, except as in this Constitution expressly provided."

Taking these provisions together, appellant argues, as noted above, that to allow bonds to be issued upon the mere decision of the public officials involved prior to any judicial determination as to the act's constitutionality would leave appellant bound to long term obligations without any legal remedy. Essentially the same argument is made in reference to the provisions of the Fourteenth Amendment to the U. S. Constitution. In appellant's own words:

"It is of the utmost importance for the court to recognize the effect of the ruling which the defendants are requesting. In the event this court would hold that the special taxing districts of the consolidated city were authorized to sell bonds binding the taxpayers of the community for up to 50 years to the extent of 40 or 50 million dollars, the effect of the ruling would strike at the very foundation of our free constitutional government.

A General Assembly controlled by either well meaning people or revolutionary adventurers could adopt legislation which it either knows is unconstitutional or which is in fact unconstitutional. Representatives of the municipal corporation created, either associates (sic) of the revolutionary adventurers or well meaning people concerned more with immediate plans than fundamental principals (sic) of freedom, could determine to obligate the taxpayers of the municipal (sic) corporation for 50 years to repay principal and interest on a bond issue. Taxpayers who will be injured by the unconstitutional tax burden would immediately seek the only recourse available to prevent the imposition

of the tax burden knowing 'that every man, for injury done to his person, property or reputation, shall have remedy by due course of law.' An action would be filed prior to the sale of any bonds. The court recognizing that neither the executive nor the legislative branch of government can exercise judicial functions, and knowing that one of the judicial functions is determining the constitutionality of legislation as the only protection against the unconstitutional usurpation of power realizes that the municipal corporation as a branch of the executive-administrative department cannot act until the judiciary had an opportunity to determine the constitutionality of the statute to provide a remedy to the protesting citizens. In that event the executive department and third parties dealing with it must act as (sic) their peril. In the event the hypothetical case does not, accurately describe constitutional government, the action purporting to bind the taxpayer is an extra legal action of a group existing without government sanction. At a time when city fathers are greatly disturbed and deeply resentful of young men and women who believe that their ambitions can be achieved by doing violence to the constitutional rights of other persons, the action of the special taxing districts is not only contrary to American principles of free constitutional government, but it will become a source of great encouragement for violence prone young people to see the city fathers engage in the same disregard of constitutional government."

Appellant's point, although appearing to be somewhat exaggerated and emotionally saturated is nevertheless well taken. This court expressly recognizes that in certain situations injunctive relief may not only be appropriate but might possibly be the sole means by which citizens are enabled to protect their interests against governmental action taken pursuant to a statute whose constitutionality is as yet an unresolved question.

If then, injunctive relief is to be appropriate under certain such circumstances, what factors should be given weight when determining in what cases it should be granted? Although we do not propose to set out an exhaustive list of considerations, certainly such factors as (1) the nature of the proposed action, (2) the nature and scope of its effect on the citizenry,

(3) the relative significance of the proposed action to the total statutory scheme under question, (4) the necessity, in the interests of effective government, of immediate implementation of the proposed action, (5) the disruptive effect of injunctive relief on other governmental operations, (6) the consequences should injunctive relief be denied and the statute subsequently found to be unconstitutional and (7) the uniqueness of the statutory scheme under which the action is proposed, might play a role.

Looking to the instant case we note that the bond issuance of the several taxing districts here sought to be enjoined totals approximately forty million dollars. Needless to say, the resulting tax burden on the taxpayers of Marion County is sizeable. Even though the authority to issue the bonds in question might be considered of relatively small significance in relation to the total statutory scheme of governmental reorganization brought into issue by the original complaint in this case, the possibility of their issuance presents the spectre of an onerous tax burden for years to come and must not be minimized. The defendants fail to allege nor is there anything in the record which would indicate the necessity of immediate issuance of the bonds. However we take judicial notice of the fact that should an injunction issue in this case, further litigation on the question of the constitutionality of the statute through the appellate level would take months at best and that as a consequence all proposed improvements would be forestalled pending a final determination. The ultimate effect on governmental services in the consolidated city of Indianapolis is not known although it would be difficult indeed to imagine that the effect would be other than disruptive and undesirable.

The largest single determining factor in this case in regard to the propriety of injunctive relief in our view, however, is that the consequences will be minimal even though injunctive relief be denied and the statute subsequently found to be unconstitutional.

As indicated by appellee, all special taxing districts here involved were in existence prior to or are created independently of Chapter 173 of the 1969 Acts. According to stipulations entered into evidence, the Department of Parks and Recreation has proposed acquisitions and improvements requiring a special taxing district bond issue of approximately four million, seven hundred fifteen thousand dollars ($4,-715,000). It was further stipulated that the proposed projects are to be financed by the issuance of special taxing district bonds from the special taxing district established for park purposes. Ind. Ann. Stat. § 48-9372 (1969 Supp.) specifically provides in pertinent part:

> "Any existing special taxing district created by any such statutes with powers over parks and recreation, except where any power in such statute is distributed under this act to another department shall continue as a special taxing district of the consolidated city with boundaries *which are the same as the boundaries of such district on the effective date of this act.*" (our emphasis)

Consequently it is apparent that Chapter 173 vested no authority in the consolidated city to issue park district bonds other than that authority which existed prior to and independently of the statute. The constitutionality of the park district as a special taxing district was affirmed by this court in the cases of *Johnson* v. *Board of Park Commissioners of Fort Wayne* (1930), 202 Ind. 282, 174 N. E. 91 and *Lurie* v. *City of Indianapolis* (1964) 245 Ind. 457, 198 N. E. 2d 755.

Likewise the Department of Public Works has proposed various projects requiring a special taxing district bond issue of approximately nine million, eight hundred twenty thousand dollars. ($9,820,000). It was stipulated that the financing of these projects was to be accomplished by the issuance of special taxing district bonds from the special taxing district established for sanitary purposes. Chapter 173 specifically incorporated the sanitary district under the jurisdiction of the department of public works. The statute further provides:

"Any existing sanitary district created by any such statutes shall continue as a special taxing district of the consolidated city, with boundaries *which are the same as the boundaries of such district on the effective date of this act.* Such boundaries of the special taxing district shall not automatically be extended by this act to the boundaries of the consolidated city, but additional territory shall be incorporated into such district in the manner prescribed by Acts 1917, c. 157, with the board of public works exercising the power of incorporation of territory of the board of sanitary commissioners under such statute, with the additional requirement that any such incorporation shall be approved by resolution of the city-county council." Ind. Ann. Stat. § 48-9347(a) (1969 Supp.) (our emphasis)

Again, it is obvious that the consolidated city was granted no additional authority by virtue of Chapter 173 to bind the citizens of Indianapolis than existed prior to the enactment of the statute. The sanitary district and its special taxing district obligations were approved by this court in *Department of Public Sanitation of City of Hammond* v. *Solan* (1951), 229 Ind. 228, 97 N. E. 2d 495.

The third department seeking to issue special taxing district bonds is the Redevelopment Commission. The commission proposes to issue approximately three million, five hundred thousand dollars ($3,500,000) of project notes to be used in connection with property acquisitions and other work for the redevelopment project identified as Project No. Ind. R-70. It was stipulated that the notes were to be payable from grants obtained from the Federal Government and proceeds from the sale of land acquired. The Redevelopment Commission was created in 1945 (Acts 1945, ch. 276 being Ind. Ann. Stat. § 48-8504 (1963 Repl.)) and a special taxing district for redevelopment purpose was at the same time established. Its constitutionality was affirmed by this court in its decision in the case of *Alanel Corp.* v. *Indianapolis Redevelopment Commission* (1958), 239 Ind. 35, 154 N. E. 2d 515. The territorial limits of the redevelopment district are defined in Chapter 173 in the following terms:

"The existing redevelopment taxing district created by such act [Acts 1945, ch. 276] shall continue as a special taxing district of the consolidated city *and its territorial limits shall be the territorial limits of the fire special service district.*" Ind. Ann. Stat. § 48-9329 (1969 Supp.) (our emphasis)

The boundaries of the fire special service district are established by Chapter 173 (Ind. Ann. Stat. § 48-9441 [1969 Supp.]) to be coterminous with the boundaries of the first class city as the same existed the day preceding the effective date of that statute. The redevelopment district boundaries are similarly defined in the Redevelopment Act:

"All of the territory included within the corporate limits of any such city having a population of more than 300,000 shall constitute a taxing district for the purpose of levying and collecting special benefit taxes for redevelopment purposes as provided in this Act." Ind. Ann. Stat. § 48-8504 (1963 Repl.)

From the foregoing it is clear that the redevelopment district boundaries as established by Chapter 173 are coincident with those provided under the Redevelopment Act of 1945 and that no additional authority to issue special taxing district bonds was vested in the Redevelopment Commission by virtue of Chapter 173 than existed previous and independently of that act.

The final department attempting to issue bonds sought to be enjoined by appellant is the Department of Transportation. According to the stipulations entered into by the parties, the Department of Transportation proposes to issue metropolitan thoroughfare district bonds in the value of approximately twenty million, six hundred and thirty nine thousand dollars ($20,639,000) for the purpose of financing several road and street construction projects. The metropolitan thoroughfare district was established by Chapter 173 (Ind. Ann. Stat. § 48-9354 [1969 Supp.]), although it exists independently of that act by reason of its incorporation by a

1969 amendment to the Mass Transportation Authority Act found at Ind. Ann. Stat. § 36-3431—36-3455 (1969 Supp.). While the validity of this special taxing district has not been expressly determined, we consider it significant for our present purposes that early decisions of this court have upheld special taxing districts established for the purpose of financing the construction of roads and streets. See for example, *Smith* v. *Board of Commissioners of County of Hamilton* (1909), 173 Ind. 364, 90 N. E. 881, which approved a county-wide special taxing district for road financing and construction. In light of this authority (although we do not purport to pass on the constitutionality of the metropolitan thoroughfare special taxing district) and the fact that the special taxing district exists independently of Chapter 173 under the Mass Transportation Authority Act with county-wide boundaries (Ind. Ann. Stat. § 36-3444 [1969 Supp.]) we hold that there is insufficient reason in policy or law to enjoin the issuance of proposed metropolitan thoroughfare district bonds.

Needless to say our conclusion is the same in respect to the special taxing district bonds of the parks and recreation, sanitary, and redevelopment districts, since legally confirmed authority for their issuance existed prior to and to the same extent as provided by Chapter 173.

Appellant points to the fact that the composition of the various boards making the decision to issue the bonds is different than those bodies with authority to issue the special district bonds under prior law. We do not, however, consider this single fact determinative of the issues before us.

Appellant raises one other question for our consideration which we have deferred until now relating to the propriety of deciding the issues presented by the supplemental complaint, to-wit: whether defendants should be enjoined from the issuance of the bonds pending a determination on the constitutionality of Chapter 173 pursuant to Rule 54(B) without, at the same time rendering a decision on the act's constitu-

tionality. Appellant argues that the court below has attempted to obviate the requirements of a "no litigation" certificate by identifying the refusal of an interlocutory order as a final judgment, thus permitting the sale of the bonds without a determination of the legality of the Act under which the bonds are to be sold. Essentially, it is appellant's contention that notwithstanding the provisions of Trial Rule 54(B) the decision on the question of issuing the bonds is so closely related and dependent upon the court's determination in regard to the constitutionality of the act that the former issue cannot be decided without a finding on the latter.

Trial Rule 54(B) provides as follows:

"(B) Judgment upon multiple claims or involving multiple parties. When more than one [1] claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. In the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties. A judgment as to one or more but fewer than all of the claims or parties is final when the court in writing expressly determines that there is no just reason for delay, and in writing expressly directs entry of judgment, and an appeal may be taken upon this or other issues resolved by the judgment; but in other cases a judgment, decision or order as to less than all the claims and parties is not final."

Quite clearly the rule allows for a prompt and expeditious disposition of severable issues which are not dependent upon the determination of the other issues in the case provided the court finds that there is no just reason for delay and there

is an express direction for entry of judgment. Trial Rule 54(B), except for the last sentence, follows Rule 54 of the Federal Rules of Civil Procedure, and as has been noted by commentators on the Federal Rules, the entry of such a partial judgment avoids the possible injustice of a delay occasioned by various claims presented under the wide scope of a civil action permitted by the rules. 3 Barron & Holtzoff, Federal Practice and Procedure, § 1193 (1958).

Notwithstanding the intended purpose of Trial Rule 54(B), its applicability to the Public Lawsuit Statute might legitimately be questioned in light of Ind. Ann. Stat. § 3-3305 (1968 Repl.) which provides for an interlocutory hearing for the purpose of setting a bond for damages accruing by reason of the filing of the lawsuit where the plaintiff cannot establish facts which would entitle him to a temporary injunction. The precise question is whether this provision is the sole procedure by which the conflicting interests of the person maintaining the suit and those of the public in being free of unnecessary delay are to be accommodated. We think not.

The wording of Ind. Ann. Stat. § 3-3304(a) (1968 Repl.) definitely indicates a policy of consolidating, for purposes of a hearing on an interlocutory order, all justiciable issues raised in a public lawsuit, but, by implication, contemplates other methods of proceeding:

> "Trial. The procedure in the trial court governing trial of the public lawsuit *shall be the same as in other civil cases. Where possible* the hearing on any interlocutory order shall be consolidated with the hearing on all other justiciable issues." (our emphasis)

Here, upon consideration of the various factors heretofore discussed, we have determined that the trial court properly denied injunctive relief. The issues relating to the constitutionality of the statute, however, encompass much broader questions for judicial determination and might properly take additional time for appropriate disposition. By holding that the issues presented by this case may

not be separately determined under Trial Rule 54(B), this court would in effect be holding that city government must always grind to a halt while dissident citizens are allowed to challenge every facet of its operation under a disputed statute. We have attempted to outline the pertinent considerations where injunctive relief is sought. Should the trial court determine that such a remedy is not appropriate, we see no valid reason for holding that a final judgment cannot be entered on one specific issue prior to a determination on all other aspects of the suit. Such a procedure would appear to be a classic example of the result sought to be accomplished by the provisions of Trial Rule 54(B). A party plaintiff's right to challenge governmental action taken pursuant to a questioned statute is protected and at the same time governmental operations are not unduly restricted.

In view of the foregoing conclusions, the judgment of the trial court is, in all respects, affirmed.

Judgment affirmed.

Arterburn and Givan, JJ., concur; DeBruler, J., dissents with opinion in which Jackson, J., concurs.

### DISSENTING OPINION

DeBruler, J.—The court today holds that the officers of the new consolidated City of Indianapolis, commonly called "Uni-Gov," may lawfully proceed to issue municipal bonds in the sum of $40,000,000.00, during the pendency of a suit attacking the constitutionality of the Act, Acts 1969, ch. 173, Burns §§ 48-9101 to 48-9507, which Act created the new city. The majority approves the separation and early disposition by the trial court of the claims of the plaintiffs for injunction against the issuance of the municipal bonds from their claims raising the constitutionality of the "Uni-Gov" Statute.

In so doing, I believe, they have erroneously approved a procedure and power which may now be exercised by our courts which is at odds with the public policy of this State

governing this type of case, as expressed in the Public Lawsuit Statute, Acts 1967, ch. 357, §§ 1 through 8, Burns §§ 3-3301 through 3-3308. It does so in this case, which is described by the appellant in his brief as "friendly" in which many obvious assertions on both sides are not made at all, and in which no showing is made that delay in the sale of these bonds and the construction of these projects will result in any significant harm or damage to the citizens of the new city. This holding will permit litigants and our courts to totally by-pass the exclusive procedures set forth in Burns § 3-3305 of the Public Lawsuit Statute which are intended to bring about a fair and just accommodation of the conflicting interests of the challenging taxpayer in maintaining his suit to test the lawfulness of government action and the public in being free from unnecessary delay and consequent damage caused by the existence of the suit.

I hasten to point out that no party to this appeal discusses the applicability of the Public Lawsuit Statute to this case, although it is unquestionable that the parties and the trial court were aware that this suit must be governed by the provisions of the Public Lawsuit Statute. The trial court in its judgment, from which this appeal is taken, states that it is as follows:

> "The Court now finds that this is a public lawsuit, under the provisions of Chapter 367 of the Acts of the General Assembly of the Stated [sic] of Indiana for the year 1967, which questions the validity of acts being taken to construct and finance public improvements and which seeks to enjoin the completion of the organization and formation of a municipal corporation pursuant to Chapter 173 of the Acts of the General Assembly of the State of Indiana for the year 1969."

The complaint alleges that the suit is a "public lawsuit" in Paragraph I:

> "The plaintiffs . . . and each of them, bring this action as a public lawsuit as Plaintiffs for themselves and for all

other persons as a class similarly situated as citizens or taxpayers."

Each legal paragraph of this complaint constitutes a public lawsuit within the definition created in § 3-3301 of the Public Lawsuit Statute:

"(b) 'Public lawsuit' shall mean any *action* whereby the validity, location, wisdom, feasibility, extent or character of construction, financing or leasing of any public improvement by any municipal corporation is questioned directly or indirectly, including but not limited to suits for declaratory judgments or injunctions to declare invalid or to enjoin such construction, financing or leasing, and *shall mean any action to declare invalid or enjoin the creation, organization or formation of any municipal corporation.* This definition, as used in this act, shall not be construed to broaden any right of action as is now validly limited by applicable law." (Emphasis added.)

It is equally clear that the Public Lawsuit Statute solely governs the rights and procedures in this suit:

"3.3302.  Bringing of public lawsuits.—All public lawsuits shall be brought solely in conformity with and governed by the provisions of this act."

In the case on appeal the separation of the plaintiffs' claim of unconstitutionality from their claim for injunction against the issuance of municipal bonds was made on motion of the defendants and was unobjected to by the plaintiffs. It was clearly intended to make possible an early determination in the trial court and in this Court of the validity of the bond issue, and thus, remove the legal cloud that was placed on that bond issue by the suit to declare ch. 173 unconstitutional and the suit to enjoin the bond issue. This was obviously a legitimate aim for the defendants to pursue. However, this should have been done under the provision of § 3-3305 of the Public Lawsuit Statute which reads as follows:

"3-3305.  Interlocutory hearing.—At any time prior to the final hearing in a public lawsuit, the defendant may

petition for an order of the court that the cause be dismissed unless the plaintiff shall post a bond with surety to be approved by the court payable to defendant for the payment of all damages and costs which may accrue by reason of the filing of the lawsuit in the event the defendant prevails. A hearing shall be had on such petition in the same manner as the hearing on temporary injunctions under Acts 1881 (Spec. Sess.) c. 38. If at the hearing the court determines that the plaintiff can not establish facts which would entitle him to a temporary injunction, *the court shall set the amount of bond to be filed by the plaintiff in an amount found by the judge to cover all damage and costs which may accrue to the defendants by reason of the pendency of the public lawsuit in the event the defendant prevails.* In the event such bond is not filed by the plaintiff with sureties approved by the court within ten (10) days after such order is entered the suit shall be dismissed. Either plaintiff or defendant may appeal such order to the Indiana Supreme Court within such ten (10) day period by notice of appeal and a statement of error in the same manner as is provided in a petition for mandate or prohibition. The Supreme Court may stay the lower court order pending its own decision, may set a bond to be filed by the plaintiff in connection therewith, may modify the order of the lower court, or may enter its order as a final order in a case. In the event no bond is filed as provided in this section the public lawsuit shall be dismissed and no court shall have further jurisdiction of the public lawsuit or any other public lawsuit involving any issue which was or could have been raised therein." (Emphasis added.)

The defendants obviously were seeking to avoid the delay in financing and constructing the projects which involved new parks, sewers, streets, parks and other public improvements. Section 3-3305 provides that defendants in the position of the defendants here desiring to avoid unnecessary and harmful delay in carrying out their proposed projects, should file a petition for dismissal of the suit or bond. The plaintiffs would then be permitted to maintain their suit in its full vigor if it met the burden of showing grounds which would suffice for the court to issue a temporary injunction. If plaintiff failed in this burden, the burden would then be upon the defendants to come forward with evidence that the delay caused by the

pendency of the suit was causing monetary damage to them. The plaintiff would then be permitted to defend against these assertions. The court would thereupon set the amount of bond. If the plaintiff posts such a bond he may maintain his suit in all its aspects and with all of its consequent delay and inconveniences to the public. If not posted, dismissal of the entire suit would result.

The Public Lawsuit Statute has been enacted by our Legislature and labored over time and again by this Court. It provides a suitable and just procedure for the resolution of the issues presented by the motion of the defendants in this suit to sever the paragraphs for injunction against the issuance of these bonds, and for an early determination of the issues raised by those paragraphs.

I would reverse the judgment of the trial court.

Jackson, J., concurs.

NOTE.—Reported in 263 N. E. 2d 266.