6 P.3d 799

OFFICE OF HAWAIIAN AFFAIRS, Rowena Akana, Haunani Apoliona, Donald Cataluna, A. Frenchy Desoto, Louis Hao, Clayton Hee, Collette Machado, Hannah Springer, and Mililani Traṣk, in their Capacity as Trustees of the Office of Hawaiian Affairs, Petitioners,

v.

Benjamin J. CAYETANO, in his Capacity as Governor of the State of Hawai'i, Respondent.

No. 23309.

Supreme Court of Hawai'i.

Aug. 28, 2000.

**2**

William C. McCorriston, Robert G. Klein, and Jonathan H. Steiner, of McCorriston,

Miho, Miller, Mukai, on the briefs, Honolulu, for petitioners.

Earl I. Anzai, Attorney General, Girard D. Lau and Charleen M. Aina, Deputy Attorneys General, on the briefs, for respondent.

MOON, C.J., LEVINSON, NAKAYAMA, and RAMIL, JJ. with ACOBA, J., Concurring Separately.

Opinion of the Court by RAMIL, J.

This is an original proceeding brought by Petitioners Office of Hawaiian Affairs and its trustees (OHA) and Respondent Governor Benjamin Cayetano, in his official capacity as Governor of the State of Hawai'i (Respondent), on an agreed statement of facts pursuant to Hawai'i Revised Statutes (HRS) § 602–5 [1] and Hawai'i Rules of Appellate Procedure (HRAP) Rule 18 [2] to answer the following questions:

1. Did the United States Supreme Court's recent opinion and judgment in *Rice v. Cayetano*, 528 U.S. 495, 120 S.Ct. 1044, 145 L.Ed.2d 1007 (2000)] create a "vacancy" that "occurs through any cause other than expiration of the term of office" under Haw.Rev.Stat. § 13D–5 as to those OHA trustees who were elected in 1996 and/or 1998? [3]

2. If the answer to question 1 is yes, so that the vacancy "shall be filled in accordance with section 17–7," [4]

---

1. HRS § 602–5(3) (1993) provides that this court has jurisdiction and power:

   To entertain, in its discretion, any case submitted without suit when there is a question in difference which might be the subject of a civil action or proceeding in the supreme court, circuit court, or tax appeal court, and the parties agree upon a case containing the facts upon which the controversy depends.

2. HRAP Rule 18 provides as follows:

   **Rule 18. AGREED FACTS: SUBMISSION ON.**
   **(a) Submission.** As authorized by law, the parties to a dispute that might be the subject of a civil action or proceeding in a Hawai'i appellate court, circuit court, district court, family court, land court or tax appeal court may, without the action of a trial court or agency agree to submit a case directly to a Hawai'i appellate court upon a statement containing the facts upon which the controversy depends, a statement of the question or issues, the contentions of the parties as to each issue, and the

form of the judgment that each party requests the appellate court to render.
HRAP Rule 18(c) provides that the appellate court may refuse to entertain a case submitted on agreed facts, and if the appellate court entertains the case, the judgment shall be entered and may be enforced as in other cases, subject to the right of a party to move for reconsideration.

3. HRS § 13D–5 (1993) provides in relevant part as follows:

   Any vacancy that may occur through any cause other than the expiration of the term of office shall be filled in accordance with section 17.7.

4. HRS § 17–7 (1993) provides as follows:

   **§ 17–7 Board of Trustees, office of Hawaiian affairs.** (a) Whenever any vacancy in the membership of the board of trustees occurs, the term of which ends at the next succeeding special election held in conjunction with the general election, the vacancy shall be filled by a two-thirds vote of the remaining members of

A. When does (or did) the vacancy occur?

B. Who is authorized under Haw.Rev. Stat. § 17-7 to fill the vacancy?

C. What is the time period the person (or persons) authorized to file the vacancy has (or have) to fill the vacancy?

For the reasons set forth below, we conclude that *Rice v. Cayetano* did not automatically create any vacancy in the Office of Hawaiian Affairs pursuant to HRS § 13D-5. We agree with Respondent's contention that the trustees became *de facto* trustees as a result of the issuance of *Rice v. Cayetano,* but Respondent presents no legal authority to support his contention that a finding that the trustees are *de facto* trustees automatically creates vacancies, which must be filled in accordance with HRS § 17-7.[5] Neither HRS § 13D-5 or HRS § 17-7 create vacancies. The statutes set forth only the procedure to follow when a vacancy occurs. Thus, the answer to Question 1 is "NO." Because there are no vacancies in the Office of Hawaiian Affairs Board of Trustees as a result of the *Rice v. Cayetano* decision, it is unnecessary for the court to answer the remaining questions.

## I. BACKGROUND

Petitioners Hannah Springer, Haunani Apoliona, and Collette Machado were elected as members of the board of trustees of OHA in the November 1996 election. Their terms expire this year, and they must run in the November 2000 election if they wish to retain their seats. Petitioners Rowena Akana, A. Frenchy DeSoto, Louis Hao, Clayton Hee, and Mililani Trask were elected as members of the board of trustees of OHA in the November 1998 election. Their terms do not expire until 2002. The Respondent appointed Petitioner Donald Cataluna to the OHA board of trustees on January 25, 2000, in accordance with HRS § 17-7, after the resignation of the OHA trustee from Kauai. If Petitioner Cataluna wishes to retain his seat, he must run in the November 2000 election.

In March 1996, Harold Rice applied to vote in the November 1996 special election for OHA trustees. The State denied his application because Rice is not of Hawaiian ancestry, a statutory qualification for participating in the election. Thereafter, Rice filed a complaint against Respondent in the United States District Court for the District of Hawai'i challenging the voting requirements for OHA trustees as violative of the Voting Rights Act of 1965, the Civil Rights Act of

---

the board. If the board fails to fill the vacancy within sixty days after it occurs, the governor shall fill the vacancy within ninety days after the vacancy occurs. When island residency is required under section 13D-1, the person so appointed shall reside on the island from which the vacancy occurred and shall serve for the duration of the unexpired term.
(b) In the case of a vacancy, the term of which does not end at the next succeeding special election held in conjunction with the general election:
(1) If it occurs not later than on the sixtieth day prior to he next succeeding special election held in conjunction with the general election, the vacancy shall be filled for the unexpired term at the next succeeding special election held in conjunction with the general election. The chief election officer shall issue a proclamation designating the election for filling the vacancy. All candidates for the unexpired term shall file nomination papers not later than 4:30 p.m. on the fiftieth day prior to the special election (but if such day is a Saturday, Sunday, or holiday then not later than 4:30 p.m. on the first working day immediately preceding) and

shall be elected in accordance with this title. Pending the election, the board or the governor shall make a temporary appointment to fill the vacancy in the manner prescribed under subsection (a) and shall be elected in accordance with this title. When island residency is required under section 13D-1, the person so appointed shall reside on the island from which the vacancy occurred, and shall serve for the duration of the unexpired term and shall serve until the election of the person duly elected to fill such vacancy.
(2) If it occurs after the sixtieth day prior to the next succeeding special election held in conjunction with the general election, the board or the governor shall make the appointment to fill the vacancy in the manner prescribed under subsection (a). When island residency is required under section 13D-1, the person so appointed shall reside on the island from which the vacancy occurred, and shall serve for the duration of the unexpired term.

**5.** We believe that a determination of the present status of the trustees flows directly from the agreed facts and questions presented.

**4**

1871, the fourteenth and fifteenth amendments to the United States Constitution, and article I, section 5 and article II, section 1 of the Hawai'i Constitution. Rice sought the following relief: (1) the convening of a three-judge district court panel, as required by 28 U.S.C. § 2284, to hear and determine the case; (2) a preliminary and permanent injunction enjoining the State from conducting any election in which the franchise is qualified by race; (3) a declaratory judgment that the qualification for voting complained of violates the fourteenth and fifteenth amendments to the United States Constitution, the Civil Rights Acts of 1866 and 1871, the Voting Rights Act of 1965, and article I, section 5 and article II, section 1 of the Hawai'i Constitution; (4) a declaratory judgment that the present trustees of OHA were unconstitutionally and unlawfully elected and have no power to act in furtherance of the laws of the State of Hawai'i; (5) an order directing the State of Hawai'i to pre-clear any future voting changes pursuant to Section 3(c) of the Voting Rights Act of 1965, 42 U.S.C. § 1973a, by submitting such to the court or the United States Attorney General; and (6) an award of costs to Rice.

On February 26 and 28, 1997, Rice and the State filed cross-motions for partial summary judgment on Rice's claim that the voting requirements for OHA elections violated the fourteenth and fifteenth amendments. The district court granted summary judgment in favor of the State, concluding that the method of electing OHA trustees as provided by state law met constitutional standards and did not violate the United States Constitution's ban on racial classification. *Rice v. Cayetano*, 963 F.Supp. 1547 (D.Haw.1997). Rice appealed from the decision, and, on June 22, 1998, the United States Court of Appeals for the Ninth Circuit issued an opinion affirming the district court decision. *Rice v. Cayetano*, 146 F.3d 1075 (9th Cir. 1998). The Ninth Circuit specifically noted that Rice had abandoned his claims under the Voting Rights Act and the Civil Rights Act and had not challenged the constitution-

ality of the underlying programs or of OHA itself.

The United States Supreme Court granted Rice's application for certiorari, 526 U.S. 1016, 119 S.Ct. 1248, 143 L.Ed.2d 346 (1999), and, on February 22, 2000, the Supreme Court issued an opinion reversing the appellate decision and holding that the race-based voting restriction under review was prohibited by the fifteenth amendment.[6] *Rice v. Cayetano*, 528 U.S. 495, 120 S.Ct. 1044, 145 L.Ed.2d 1007 (2000). In rendering its decision, the Court noted that "[t]he validity of the voting restriction is the only question before us. As the court of appeals did, we assume the validity of the underlying administrative structure and trusts, without intimating any opinion on that point." *Rice*, 528 U.S. at 522, 120 S.Ct. at 1059. On February 29, 2000, the Supreme Court issued a judgment that states in relevant part:

> [I]t is ordered and adjudged by this Court that the judgment of the above court in this cause is reversed with costs and the case is remanded to the United States Court of Appeals for the Ninth Circuit for further proceedings in conformity with the opinion of this court.

The case was subsequently remanded from the United States Court of Appeals to the district court. On April 4, 2000, Rice and the State entered into the following stipulation:

> 1. Judgment in this court be entered declaring only that denying plaintiff Harold F. Rice the right to vote in elections of trustees for the Office of Hawaiian Affairs because he is not "Hawaiian" violated the Fifteenth Amendment;
>
> 2. Other than to apply for costs and move for an award of reasonable attorney's fees, plaintiff seeks no further relief in this case;
>
> 3. No further issues or claims remain in this case to be decided or resolved.

On April 11, 2000, the district court issued an order approving the stipulation, and judgment was entered on April 18, 2000. Thus,

---

**6.** The fifteenth amendment to the United States Constitution provides that:

The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude.

although Rice sought a declaratory judgment that the present trustees were unconstitutionally and unlawfully elected and had no power to act in furtherance of the laws of the State of Hawai'i, in addition to his fifteenth amendment claim, the federal proceeding addressed only the validity of the race-based voting restriction in relation to the fifteenth amendment.[7] No court issued any decision as to whether the present trustees have power to act as trustees.

On March 30, 2000, OHA and Respondent submitted this case on an agreed statement of facts, asking this court to answer the questions set forth above. According to the agreed statement of facts, Respondent takes the following position:

> Respondent Governor Cayetano, in his capacity as Governor of the State of Hawai'i, has publicly taken the position that the elections of the eight elected OHA Trustees were invalid, and that the positions held by the eight elected OHA Trustees are therefore vacant, and that Respondent Cayetano has the authority to appoint replacement trustees to fill those alleged vacancies pursuant to Haw.Rev.Stat. § 17-7.

The official OHA position is as follows:

> The OHA Trustees have publicly taken the position that there has been no express judicial determination that the elections of

the current OHA Trustees were invalid or that the results of those elections are void, and that there is thus no vacancy which the Governor can fill, and therefore the current incumbent Trustees continue to serve legitimately through and until the termination of their current term of office.

The parties agree that their difference of opinion creates an "actual controversy" within the meaning of HRS § 632-1.[8]

OHA contends that the first question submitted to this court for decision must be answered "No" because the *Rice* decision did not create any vacancy under HRS § 13D-5, the decision being limited to the very narrow issue of the constitutionality of the "Hawaiians only" voting restriction. If we determine that a vacancy occurred when the *Rice* decision was issued, OHA contends that the time for filing the vacancy in accordance with HRS § 17-7 has passed, and no one is authorized to fill any vacancy.

In response, Respondent acknowledges that the federal decision did not specifically rule the trustees can no longer hold office, but submits that the issue whether there is a vacancy presents a question of state law. Consequently, Respondent contends that: (1) because the eight elected trustees were elected by an unconstitutional process, the trust-

7. The 2000 legislature amended HRS § 13D-3 to delete the requirement that only Hawaiians can vote for OHA trustees.

8. HRS § 632-1 (1993) provides as follows:

> In cases of actual controversy, courts of record, within the scope of their respective jurisdictions, shall have power to make binding adjudication of right, whether or not consequential relief is, or at the time could be, claimed, and no action or proceeding shall be open to objection on the ground that a judgment or order merely declaratory of right is prayed for, provided that declaratory relief may not be obtained in any district court, or in any controversy with respect to taxes, or in any case where a divorce or annulment of marriage is sought. Controversies involving the interpretation of deeds, wills, other instruments of writing, statutes, municipal ordinances, and other governmental regulations, may be so determined, and this enumeration does not exclude other instances of actual antagonistic assertion and denial of right.
>
> Relief by declaratory judgment may be granted in civil cases where the actual controversy exists between contending parties, or

> where the court is satisfied that antagonistic claims are present between the parties involved which indicate imminent and inevitable litigation, or where in any such case the court is satisfied that a party asserts a legal relation, status, right or privilege in which the party has a concrete interest and that there is a challenge or denial of the asserted relation, status, right or privilege by an adversary party who also has or asserts a concrete interest therein, and the court is satisfied also that a declaratory judgment will serve to terminate the uncertainty or controversy giving rise to the proceeding. Where, however, a statute provides a special form of remedy for a specific type of case, that statutory remedy shall be followed, but the mere fact that an actual or threatened controversy is susceptible of relief through a general common law remedy, a remedy equitable in nature, or an extraordinary legal remedy, whether such remedy is recognized or regulated by statute or not, shall not debar a party from the privilege of obtaining a declaratory judgment in any case where the other essentials to such relief is present.

ees are not lawful *"de jure"* trustees, but only *"de facto"* trustees; (2) because the eight trustees are not lawful *"de jure"* trustees, there is a vacancy within the meaning of HRS §§ 17–7 and 13D–5; and (3) given the time frame, only Respondent has the authority to appoint replacement trustees.[9]

## II. *DISCUSSION*

■ Inasmuch as this case comes to us on an agreed statement of facts and questions prepared by the parties, we are confined to answering only the questions set forth and stipulated to by the parties. *See Office of Disciplinary Counsel v. Lau,* 79 Hawai'i 201, 204, 900 P.2d 777, 780 (1995) (parties are ordinarily bound by their stipulations). With this limitation in mind, we proceed with our analysis of the questions presented.

■ Although the agreed facts submitted by the parties indicate that Respondent believes that *Rice v. Cayetano* invalidated the election of eight of the trustees, the parties, in their respective briefs, seem to agree that the Supreme Court, itself, did not specifically invalidate the election or find that the unconstitutional nature of the voting requirement mandates a new election. In numerous cases, the federal courts have imposed invalidation as a remedy for constitutional irregularities in state elections. *See Generally* K. Starr, *Federal Judicial Invalidation as a Remedy for Irregularities in State Elections,* 49 N.Y. U.L.Rev. 1092 (1974). Voiding an election and ordering a new one represents one of the more extreme remedies available to a court sitting in equity and is not a necessary response to all unconstitutional practices. *Putter v. Montpelier Public School System,* 166 Vt. 463, 697 A.2d 354, 357 (1997). The Vermont Supreme Court, reviewing the issue of invalidation of a state election, explained the federal position as follows:

> Courts reviewing election challenges under federal law have established a high threshold for what one court has described as the "[d]rastic, if not staggering" equitable remedy of election invalidation. *Bell v. South-well,* 376 F.2d 659, 662 (5th Cir.1967); *see also Gjersten,* 791 F.2d at 478 (courts should not lightly "resort to this intrusive remedy"). "The setting aside of an election is an extraordinary remedy," observed the court in *Smith v. Paris,* 257 F.Supp. 901, 905 (M.D.Ala.1966), "which the Court should grant only under the most extraordinary of circumstances." Dilution of votes through malapportioned districts, *Reynolds v. Sims,* 377 U.S. 533, 554, 84 S.Ct. 1362 1377–78, 12 L.Ed.2d 506 (1964); purposeful or systematic discrimination against voters of a certain class, *Hadnott v. Amos,* 394 U.S. 358, 366–67, 89 S.Ct. 1101, 1105–06, 22 L.Ed.2d 336 (1969); pervasive election fraud, *Griffin v. Burns,* 570 F.2d 1065, 1074, 1078–80 (1st Cir.1978) and "other wilful conduct which undermines the organic process by which candidates are elected," *Hennings v. Grafton,* 523 F.2d 861, 864 (7th Cir.1975), represent the kinds of violations for which courts have typically employed the new election remedy.
>
> Conversely, courts have frequently declined to order a new election where the governmental misconduct, considered in light of all the circumstances did not warrant so extraordinary and destabilizing a remedy. *See, e.g. Saxon v. Fielding,* 614 F.2d 78, 79–80 (5th Cir.1980); *Hennings,* 523 F.2d at 864; *Hamer v. Ely,* 410 F.2d 152, 156 (5th Cir.) *cert. denied,* 396 U.S. 942, 90 S.Ct. 372, 24 L.Ed.2d 243 (1969). In determining whether such drastic relief is warranted, courts have focused on several key considerations, including the nature and severity of the federal violation, the probability that it actually affected the election result, the presence or absence of culpable intent, and the harm to the organic process of the election. *Gjersten,* 791 F.2d at 478–79, *Bodine v. Elkhart County Election Board,* 788 F.2d 1270, 1272 (7th Cir.1986); *Hendon v. North Carolina State Bd. Of Elections,* 710 F.2d 177, 182 (4th Cir.1983); *Hennings,* 523 F.2d at 864.

*Putter,* 697 A.2d at 357.

Although Respondent believes federal law would support invalidation and removal of

---

9. Respondent contends that the vacancies occurred when the Supreme Court issued its judg-ment.

the eight trustees, he contends it is unnecessary to consider federal jurisprudence and submits that eight "vacancies" were created within the meaning of HRS §§ 17-7 and 13D-5 [10] by the *Rice* ruling. Respondent bases this conclusion on the following two-step process: (1) the *Rice* ruling means that eight trustees are only *de facto* trustees, and not lawful, *i.e.*, "*de jure*" trustees; and (2) because the eight trustees are not lawful "*de jure*" trustees, there are eight "vacancies" within the meaning of the relevant statutes.[11]

OHA disputes the proposition that the trustees are *de facto* trustees, but argues that, even if the trustees are *de facto* trustees, they continue to perform the function of their office until a direct legal action for removal is filed against them.

■ An "officer de jure" is defined as follows:

> An "officer de jure' is one who is in all respects legally appointed [or elected] and qualified to exercise the office; one who is clothed with the full legal right and title to the office; in other words, one who has been legally elected or appointed to an office and who has qualified himself [or herself] to exercise the duties thereof according to the mode prescribed by law.

*Brown v. Anderson*, 210 Ark. 970, 198 S.W.2d 188, 190 (Ark.1946). *See also Grooms v. La Vale Zoning Board*, 27 Md. App. 266, 340 A.2d 385, 390 (1975).

■■ A officer becomes a *de facto* officer under four circumstances: (1) by exercising his or her duties without a known appointment or election, but under such circumstances of reputation or acquiescence as were calculated to induce people, without inquiry, to submit to or invoke his or her action, supposing him or her to be the officer he or she assumed to be; (2) where the official exercises his or her duties under color of known and valid appointment or election, but fails to conform to some precedent, requirement, or condition, such as to take an oath, give a bond, or the like; (3) under color of a known election or appointment, void because the officer was not eligible, or because there was a want of power in the electing or appointing body, or by reason of some defect or irregularity in its exercise, such ineligibility, want of power, or defect being unknown to the public; or (4) under color of any election or an appointment by or pursuant to a public unconstitutional law, before the same is adjudged as such. *See, e.g., Smejkal*, 395 N.W.2d at 590-91; *Rivera v. City of Laredo*, 948 S.W.2d 787, 794 (Tex.Ct.App.1997); 63C Am.Jur.2d Public Officers and Employees § 23 (2d. Ed 1997). Courts have consistently held that actions taken by *de facto* officeholders are valid and enforceable. *State v. Villeza*, 85 Hawai'i 258, 271 n. 19, 942 P.2d 522,

10. There is no definition of "vacancy" within the statute. Black's Law Dictionary defines "vacancy" as follows:
> A place or position which is empty, unfilled, or unoccupied. An unoccupied or unfilled post, position, or office. An existing office, etc., without an incumbent. The state of being destitute of an incumbent, or a proper or legally qualified officer. The term is principally applied to the interruption in the incumbency of an office, or to cases where the office is not occupied by one who has a legal right to hold it and to exercise the rights and perform the duties pertaining thereto. The word "vacancy" when applied to official positions, means in its ordinary and popular sense, that an office is unoccupied and that there is no incumbent who has a lawful right to continue therein until the happening of a future event, though the word is sometimes used with reference to an office temporarily filled.

Black's Law Dictionary at 1548 (6th ed.1990).

11. Respondent argues that if HRS §§ 17-7 or 13D-5 contained an additional provision stating that "a vacancy within the meaning of this statute is created when it is determined that a sitting OHA trustee was elected by a process that violates the Fifteenth Amendment," OHA would have to concede that *Rice* created eight vacancies. If there was such a provision in the statute, we agree that, as a matter of law, Respondent would prevail. However, as Respondent acknowledges, there is no such provision in the statute.

In comparison, HRS § 831-2 (1993) provides that a person who is sentenced for a felony may not hold public office from the time of the person's sentence until the person's final discharge, and "[a] public office held at the time of sentence is forfeited as of the date of the sentence if the sentence is in this State, or if the sentence is in another state or in a federal court, as of the date a certification of the sentence from the sentencing court is filed in the office of the lieutenant governor who shall receive and file it as a public document."

533 n. 19 (1997); *In re Application of Sherretz,* 40 Haw. 366 (1953); *Smejkal,* 395 N.W.2d at 591. *Rivera,* 948 S.W.2d at 794.

Respondent is correct in his assertion that the OHA trustees are now *de facto* trustees. The eight OHA trustees, elected in the 1996 and 1998 elections, are officers who were elected under the color of an election pursuant to an unconstitutional public law, before the law was adjudged to be unconstitutional. *See Platte v. Dortch,* 255 Ind. 157, 263 N.E.2d 266, 269 (1970) (one who is elected to an office under an unconstitutional statute is a *de facto* officer); *Seaman v. Fedourich,* 47 Misc.2d 26, 262 N.Y.S.2d 591 (N.Y.Sup.Ct. 1965) (councilmen elected under unconstitutional apportionment law are *de facto* councilmen). Nonetheless, even if the eight OHA trustees are *de facto* trustees, Respondent offers no legal authority, and we have found none, to support the conclusion that there is an automatic vacancy when an officer holder becomes a *de facto* official due to the finding by a federal court that a portion of an election statute is unconstitutional. By contrast, there is legal authority that further removal action is required before the office is deemed vacant. *See Seaman,* 262 N.Y.S.2d at 592; *Toyah School District v. Pecos–Barstow Consolidated Independent School District,* 497 S.W.2d 455 (Tex.Civ.App.1973). *See also,* 63C Am.Jur.2d Public Officers and Employers § 35 (a *de jure* officer who becomes ineligible to hold office during the term of office becomes a *de facto* officer until ousted in an appropriate proceeding).

The *Seaman* court considered the status of councilmen elected before entry of a judgment finding that a method of apportionment was unconstitutional. The New York court acknowledged that the district plan under which the councilmen were elected was unconstitutional and that any election held under it was illegal. The court noted, however, that the judgment determined only the constitutionality of the districting plan and did not question the right of the councilmen to serve their full terms as elected officials. Thus, the court concluded that the councilmen were *de facto* councilmen and could not be removed except in a proper proceeding directed to that end. *Seaman,* 262 N.Y.S.2d at 592.

In *Toyah,* the appellant filed suit to set aside an order regarding the annexation of a school district. One of the issues was whether a member of the school board had vacated his office by moving from the district from which he was elected. Although the jury decided the issue, on appeal the court concluded that the issue was improperly brought in the action because any action regarding the authority of an official to hold office should be brought through a *quo warranto* proceeding. *Toyah,* 497 S.W.2d at 457.

Just as in *Seaman* and *Toyah,* the State must take further action apart from this proceeding before the positions presently held by the eight OHA trustees, elected in 1996 and 1998, are deemed vacant and ready to be filled pursuant to HRS § 17–7. Considering all of the relevant statutes and case authority in relation to the questions presented to this court for decision, the *Rice v. Cayetano* opinion did not create a "vacancy" that "occurs through any cause other than expiration of the term of office" under HRS § 13D–5.

■ Although we agree with Respondent's contention that the Supreme Court opinion changed the status of the elected OHA trustees from *de jure* officeholders to *de facto* officeholders, the instant proceeding is not the appropriate proceeding to determine the present status of the trustees. If, in addition to the questions presented in the instant case, the State wishes to seek judicial determination of the propriety of the trustees to remain in their positions and believes the trustees should no longer hold office as a result of *Rice v. Cayetano,* the State should seek relief through a *quo warranto* petition filed pursuant to HRS chapter 659.[12] Pro-

12. HRS § 659–1 (1993) defines "quo warranto" in relevant part as follows:

This is an order issuing in the name of the State by a circuit court and directed to a person who claims or usurps an office of the State or of any subdivision thereof ... inquiring by what authority the person claims the office or franchise.

The method for pursuing a *quo warranto* proceeding set forth in HRS chapter 659 (1993) is as follows:

ceeding in that manner would allow the parties to present their reasons as to why the trustees should or should not be allowed to continue in office until the next election.[13] Although HRS § 659–10 provides that the chapter shall not preclude the obtaining of relief available by *quo warranto* by other appropriate action, whether the trustees should be removed cannot be resolved in this action. This original proceeding is limited in scope to the questions presented by the parties and cannot extend beyond the proposed questions and agreed statement of facts. Any court presiding over a *quo warranto* proceeding will need to consider more than the agreed facts presented by the parties in the instant case. Inasmuch as *Rice v. Cayetano* did not result in the automatic vacancy of the offices of the elected OHA trustees, we need not answer the remaining questions.

## III. CONCLUSION

Based upon the foregoing, we conclude that the United States Supreme Court's recent opinion and judgment in *Rice v. Cayetano* did not create "vacancies," and, thus, there is no "vacancy" that "occurs through any cause other than the expiration of the term of office" under HRS § 13D–5 at this time.

Concurring Opinion of ACOBA, J.

I concur in the majority's conclusion that a quo warranto suit is the appropriate proceeding for fashioning an orderly transition in the board of trustees of the Office of Hawaiian Affairs (OHA) and that the official status of the Trustees is no longer open to question, for the reasons set forth herein.

## I.

*Rice v. Cayetano*, 528 U.S. 495, 120 S.Ct. 1044, 145 L.Ed.2d 1007 (2000), has altered in a very profound way, the course chosen and ratified by the people of Hawai'i to remedy and redress past wrongs to persons of Hawaiian ancestry. By invalidating the Hawai'i Constitution's mandate under Article XII, Section 5, that the "board of trustees for the [OHA be] elected by qualified voters who are Hawaiians, as provided by law" and related statutes, Hawai'i Revised Statutes §§ 13D–1 and –3(b)(1) (1993), a majority of the United States Supreme Court (the *Rice* majority) has recast the legal framework within which the objectives embodied in Article XII may be implemented. *Rice*, 528 U.S. at 508, 120 S.Ct. at 1052.

Although Justice John Paul Stevens, in his dissent,[1] lamented that the *Rice* majority "ignores the overwhelming differences between the Fifteenth Amendment case law on which it relies and the unique history of the State of Hawaii[,]" *id.* at 546, 120 S.Ct. at 1072, the *Rice* majority left no doubt under its construction of the Fifteenth Amendment that a voting method based on race or ancestry in a state election is prohibited. *Id.* at 524, 120 S.Ct. at 1060. Distinguishing Indian "tribal elections established by the federal statutes" in which non-Indians are not permitted to vote because "such elections are

**§ 659–4 Petition.** The order is obtained by petition addressed to the circuit court setting out facts sufficient to show a right to the order, and sworn to if the application is made by a private individual, or is made by the attorney general as provided by section 659–6.

**§ 659–5 Answer.** The person to whom the order is directed shall file the person's answer in writing, within the time limited by the order as determined by the court in its discretion, and state the authority under which the person claims to act.

**§ 659–6 Judgment as to offices; burden of proof.** If a person to whom an order is directed with respect to an office of which the person performs the duties does not answer within the time allowed or the answer is insufficient or it is found that the person has usurped the office or continues in it unlawful-

ly, the court in addition to declaring the person not qualified to fill the office and forbidding the person to perform the duties of the office any longer, may direct that a new appointment be made and may grant other appropriate relief.

If the proceeding is commenced by verified petition of the attorney general and concerns a public office, the respondent shall have the burden of proof.

13. The parties set forth their positions as to whether the trustees should remain in office after *Rice v. Cayetano.* Because of the limited nature of this proceeding, we cannot consider or comment on those statements.

1. Justice John Paul Stevens was joined in part by Justice Ruth Bader Ginsberg.

the internal affair of a quasi-sovereign[,]" *id.* at 519-21, 120 S.Ct. at 1058–59, the *Rice* majority observed that non-Hawaiians cannot be excluded from OHA elections since in contrast to federal tribal elections, "OHA elections ... are the affair of the State," OHA being "a state agency, established by the State Constitution, responsible for the administration of state laws[.]" *Id.* at 520, 120 S.Ct. at 1059. Positing that "[e]ven were [it] to take the substantial step of finding authority in Congress, delegated to the State [of Hawai'i], to treat Hawaiians or native Hawaiians [like Indian] tribes," *id.* at 519, 120 S.Ct. at 1058, the *Rice* majority would rule that even the United States "Congress may not authorize a State [such as Hawai'i] to create a voting scheme of this sort." *Id.* at 519, 120 S.Ct. at 1058.

In arriving at its decision, the *Rice* majority asserted that "it demeans the dignity and worth of a person to be judged by ancestry instead of by his or her own merit and essential qualities." *Id.* at 517, 120 S.Ct. at 1057. On the other hand, Justice Stevens contended that "the [voting] classification [for "Hawaiians" as statutorily defined] is not demeaning at all, ... for it is simply not based on the premise that citizens of a particular race are somehow more qualified than others to vote on certain matters." *Id.* at 545, 120 S.Ct. at 1072 (internal quotation marks and citations omitted). Justice Stevens maintained that "[t]he political and cultural concerns that motivated the nonnative majority of Hawaii[ ] voters to establish OHA reflected an interest in preserving through the self-determination of a particular people ancient traditions that they value." *Id.* at 546, 120 S.Ct. at 1072. The *Rice* majority,

nevertheless, rejected this view of the OHA elections and concluded that permitting "a State, by racial classification, to fence out whole classes of its citizens from decision-making in critical state affairs[,]" is "forbid[den]" by the Fifteenth Amendment. *Id.* at 522, 120 S.Ct. at 1059.

II.

Article VI of the United States Constitution directs that the "Constitution [of the United States] ... shall be the supreme Law of the.Land; and the Judges of every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." Hence, by virtue of Article VI, we as State supreme court justices are bound to uphold and to apply the Fifteenth Amendment as construed by the *Rice* majority in the context of this case.[2]

III.

While at one point in time the status of the Trustees was a matter of dispute, their standing is no longer a matter for serious argument. The *Rice* majority focused on "[t]he validity of the voting restriction" in OHA elections as "the only question before" it. *Id.* at 521, 120 S.Ct. at 1059. Reasoning that "[t]he elections for OHA trustee are elections of the State, not of a separate quasi-sovereign, and [that] *they are elections to which the Fifteenth Amendment applies* [,]" *id.* at 497, 120 S.Ct. at 1046 (emphasis added), the *Rice* majority held that "the Fifteenth Amendment invalidates the electoral qualification based on [Hawaiian] ancestry." *Id.* at 524, 120 S.Ct. at 1060.

**2.** Although we are bound by Article VI to follow the rationale in *Rice,* we need not, in my view, concur in matters not material to that rationale. In concluding its decision, the *Rice* majority reminded the State of Hawai'i that "it must, as always, seek ... political consensus ... [and o]ne of the necessary beginning points is this principle: The Constitution of the United States, too, has become the heritage of all the citizens of Hawai'i." *Rice,* 528 U.S. at 524, 120 S.Ct. at 1060. I do not understand the State's position to have ever disavowed our constitutional heritage and find nothing in the decisions of Judge David Ezra of the Hawai'i Federal District Court, or in the opinions of the Ninth Circuit Court of Appeals, or of the dissenting United States Supreme Court justices espousing that view of the State's arguments.

The history of Hawai'i and its peoples demonstrates nothing, if not the wholesale embracement of democratic principles. Few places in the United States have brought democracy's promise closer to reality, *see id.* at 512, 120 S.Ct. at 1054, and a more successful marriage between constitution and culture, as that exemplified in our State, can hardly be found. Hawai'i has affirmed our constitutional heritage, Hawai'i has upheld that heritage, and Hawai'i's own have *many times been in the forefront of defending it.*

Thus, it is plain that if the *Rice* holding means anything at all, it is as Respondent contends, "that the elections of the eight elected OHA Trustees were invalid." *See* Agreed Statement of Facts at 6, ¶ 26. The Trustees correctly maintain that "there has been no *express* judicial determination that the elections were invalid . . . or that the results . . . are void." Agreed Statement of Facts at 6, ¶ 27 (emphasis added). But since the present Trustees were chosen in "elections to which the Fifteenth Amendment applies[,]" *Rice,* 528 U.S. at 497, 120 S.Ct. at 1046, the irrefutable conclusion left for this court, which I believe we cannot avoid, is that the Trustees' elections were indeed invalid.

### IV.

As presented to us, the parties' agreed question, if taken literally, poses no controversy since Respondent and the Trustees agree and it is uncontroverted that the United States Supreme Court did not expressly rule on the status of the individual trustees. Majority opinion at 5, 6 P.3d at 804. Rather, the "controversy" lies in whether the legal status of the Trustees has been affected by the *Rice* majority's condemnation of a process by which the Trustees hold office. Consequently, what the parties have requested us to decide, and what we must consider in the process of arriving at the answer (as assumably we engaged to do in accepting the question for review) is the *effect* of the *Rice* decision on the status of the Trustees. The effect of that decision, which seems to me now to be beyond dispute, is that the individual trustees are no longer *de jure* officials. For it is well established that a law which is unconstitutional is a nullity; thus, however one may sympathize with the Trustees because of the dilemma which *Rice* creates for them, their selection under an unconstitutional law must now be viewed as permanently impaired.

### V.

In sum, I believe we are obligated to formalize what should be a self-evident proposition. A pronouncement by this court that the Trustees are no longer of *de jure* status at this juncture would enable them to assess what institutional gain is to be obtained from fending off what may be inevitable and ines- capable, and, accordingly, to chart their course of action; a course which need not necessarily be limited to defending subsequent quo warranto proceedings. We cannot discount the possibility that the parties may be able to agree to an orderly and timely transition of the OHA board in the interest of the State and of OHA, without further court intervention, if aided by this court's unambiguous determination as to the current status of the Trustees. In any event, nothing is to be gained by postponing that determination to quo warranto proceedings in the circuit court since it is purely one of law, which we are as capable as the circuit court of making and, further, one that we are compelled to render by the holding in *Rice.*